UNITED STATES DISTRICT COURT                b
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

PAMELA THIBODEAUX                    CIVIL ACTION NO. 2:16-CV-01749
BRASSEAUX

VERSUS                               JUDGE TRIMBLE

U.S. COMMISSIONER, SOCIAL            MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION

---

## REPORT AND RECOMMENDATION

I.   **Background**

    A.   **Procedural Background**

       Pamela Thibodeaux Brasseaux ("Brasseaux") filed an application for disability insurance benefits ("DIB") on December 26, 2013, alleging a disability onset date of October 1, 2012 (Doc. 5-1, p. 168/259) due to fibromyalgia, depression, and anxiety (Doc. 5-1, p. 190/259). That application was denied by the Social Security Administration ("SSA") (Doc. 11-1, p. 80/259).

       A *de novo* hearing was set for March 2015 before an administrative law judge ("ALJ"). Brasseaux appeared with her attorney and a vocational expert ("VE") (Doc. 11-1, p. 59/259). At the start of the hearing, Brasseaux amended her disability onset date from October 1, 2012 to January 1, 2007, and asked for a continuance in order to gather and submit additional medical records (Doc. 11-1, p. 64/259). The hearing was postponed (Doc. 5-1, p. 64/259).

       The rescheduled *de novo* hearing was held before an ALJ in May 2015. Brasseaux appeared with her attorney (Doc 5-1, p. 36/259). The ALJ found that

Brasseaux met the insured status requirements through December 31, 2012, and through that date she had severe impairments of disorder of the cervical spine, disorder of the lumbar spine, fibromyalgia, and obesity (Doc 5-1, p. 21/259). The ALJ further found Brasseaux had the residual functional capacity to do the full range of light work and could perform her past relevant work as a sales counselor through the date last insured (Doc. 5-1, pp. 24, 27/259). The ALJ concluded that a finding of "not disabled" was directed by Medical-Vocational Rule 202.21 of 20 C.F.R. Pt. 404, Subpt. P, Appendix 2 ("the grids") (Doc. 5-1, p. 28/259). Therefore, Brasseaux was not under a "disability" as defined in the Social Security Act at any time from January 1, 2007 through December 31, 2012, the date last insured (Doc. 5-1, p. 28/259).

Brasseaux requested review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 5-1, p. 8/259). The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Brasseaux next filed this appeal for judicial review of the Commissioner's final decision. The sole issue raised by Brasseaux on appeal is whether the Commissioner properly evaluated the post-hearing treating source medical opinions from Dr. Phillip Landry and Dr. Jason Morris, regarding Brasseaux's functional abilities prior to her date last insured (December 31, 2012) (Doc. 8).

The Commissioner responded to Brasseaux's appeal (Doc. 9), and Brasseaux filed a reply (Doc. 10). Brasseaux's appeal is now before the Court for disposition.

### B.  <u>Medical Records</u>

From 2004 through 2010, Brasseaux was treated for depression and anxiety by Dr. Phillip A. Landry, a psychiatrist, and was prescribed Wellbutrin, Lexapro, Xanax, and Lunesta (Doc. 5-2, pp. 455-474, 789-796/998).   In September 2005, Dr. Landry noted Brasseaux was "stressed out" from Hurricane Rita, her job (at a funeral home), overwhelmed, unable to handle stress, depressed, unable to sleep, and planning to resign from her job (Doc. 5-2, p. 472/998).   Dr. Landry increased her Lexapro and Xanax (Doc. 5-2, p. 472/998).

By January 2006, Brasseaux had successfully returned to her job, but was very depressed, anxious, and grieving from the recent death of her brother, having difficulty going to work, and having difficulty sleeping (Doc. 5-2, pp. 471, 789/998). Brasseaux planned to apply for short-term disability (Doc. 5-2, p. 471/998).   In July 2006, Brasseaux was recovered from her depression,  had resigned from her job at the funeral home, and planned to go to school to become a contractor (Doc. 5-2, p. 468/998).   Dr. Landry found she was "doing very well" (Doc. 5-2, p. 468/998).

In January 2007, Brasseaux was dysphoric due to menopause and having stress because her husband did not like that she was no longer working, but she was doing "extremely well" by July 2007 (Doc. 5-2, pp. 466-467/998).   In 2008, Brasseaux began having problems with Lexapro, which she had been taking for five years, so she began trials of other medications, finally resuming taking Lexapro at a higher dosage (Doc. 5-2, pp. 459-64/998).   The higher dosage of Lexapro finally returned her mood to normal (Doc. 5-2, pp. 458/998).   In 2010, Brasseaux again became depressed

(Doc. 5-2, p. 457/998).  Wellbutrin was added to her medication regimen, and she became stable again (Doc. 5-2, pp. 454-457/998).

Brasseaux received ongoing treatment for chronic sinusitis, vertigo, irritable bowel syndrome, gastroesophageal reflux disease, and hypothyroidism from Dr. Morris from 2004 through 2010 (Doc. 5-2, pp. 534-551, 705-731/998).

Brasseaux was treated for recurrent urinary tract infections and urinary frequency from May 2006 to June 2011 (Doc. 5-2, pp. 570-585/998).

A cervical spine MRI in June 2009 showed Brasseaux had bulging discs and osteophytic ridging at C2-3, C4-5, and C5-6, but there was no significant stenosis (Doc. 5-2, p. 420/998).  Brasseaux was evaluated by Dr. Craig G. Morton, a physical medicine and rehabilitation specialist, in November 2009 (Doc. 5-2, p. 439/998).  Dr. Morton noted her one-year history of neck and shoulder pain after falling (Doc. 5-2, p. 439/998).  Dr. Morton also noted her history of chiropractic care, and prescribed physical therapy for cervical stabilization and occipital nerve release (Doc. 5-2, p. 426/998).  Physical therapy improved Brasseaux's range of motion and decreased her pain levels (Doc. 5-2, pp. 435, 438, 450-51/998).

Brasseaux had chiropractic treatment from September 2010 through December 2011 (Doc. 5-2, pp. 477-86/998).  Brasseaux fell again in June 2011, which caused an acute exacerbation of her back pain (Doc. 5-2, p. 478/998).

In December 2011, an MRI of Brasseaux's lumbar spine showed degenerative change in the facets at L4-5 with prominent osteophytes, but no significant spinal stenosis (Doc. 5-2, p. 422/998).  Brasseaux also had milder degenerative change at the

L3-4 and L5-S1 facets, and bilateral Tarlov cysts[1] at S2 (Doc. 5-2, pp. 422, 520/998). Brasseaux had some degeneration of the joints at L4-5 (Doc. 5-2, p. 422/998). Brasseaux was referred to Dr. Morton (Doc. 5-2, p. 422/998).

In December 2011, Brasseaux complained of low back and buttock pain going to the right thigh, worse after having been on her feet (Doc. 5-2, p. 426/998). Brasseaux was still tender and restricted in range of motion as before (Doc. 5-2, p. 429/998). Brasseaux stated both her pain medication and the chiropractor gave her some relief (Doc. 5-2, p. 426/998). A lumbar MRI showed mild facet arthrosis at L4-5 with bulging discs, and degenerative changes at L5-S1 (Doc. 5-2, p. 429/998). Dr. Morton noted that fibromyalgia complicated her condition, and diagnosed mild foraminal stenosis at L4-5 (Doc. 5-2, p. 164, 425/998). Dr. Morton prescribed a TENS unit, a Medrol dose pack, and physical therapy (Doc. 5-2, pp. 164, 425/998).

Brasseaux had chiropractic treatment in 2012 and 2013 for all-over pain and TMJ (Doc. 5-2, pp. 240-258/998).

In January 2012, Dr. Morton sent Brasseaux to physical therapy, but Brasseaux only completed 9 of the 15 prescribed visits (Doc. 5-2, p. 160/998). Dr. Morton noted that Brasseaux was doing well with Neurontin and her leg pain had resolved, but continued to have dull low back pain with standing that improved with rest (Doc. 5-2, p. 161/998). Brasseaux's medication list included Lisinopril, Lexapro,

---

[1] Tarlov cysts are sacs filled with cerebrospinal fluid that most often affect nerve roots in the sacrum, the group of bones at the base of the spine. National Institute of Neurological Disorders and Stroke: Tarlov Cysts, *available at* https://www.ninds.nih.gov/Disorders/All-Disorders/Tarlov-Cysts-Information-Page (National Institutes of Health).

Xanax, Santura, Armour Thyroid, Lunesta, and Medrol (Doc. 5-2, p. 162/998). Brasseaux was tender to palpation over the multifidus and lumbar paraspinals on the right, and the lumbar paraspinals, multifidus, and sacroiliac joint on the left (Doc. 5-2, p. 162/998). She also had mildly restricted forward flexion and moderately restricted right and left rotation/extension (Doc. 5-2, p. 162/998). Brasseaux had failed conservative care with chiropractics, so Dr. Morton prescribed physical therapy for cervical stabilization and occipital nerve release in December 2011 (Doc. 5-2, pp. 426, 477-86/998). Brasseaux noted improvement in her range of motion as well as decreased pain levels (Doc. 5-2, pp. 435, 450-51/998). Dr. Morton noted she was doing well with Neurontin, therapy was helping, and she rated her back pain a 4/10 (worse with standing, improved with rest) (Doc. 5-2, p. 161/998). Brasseaux's leg pain was resolved (Doc. 5-2, p. 162/998). Brasseaux's forward lumbar flexion was mildly restricted and her right and left lumbar rotations were moderately restricted (Doc. 5-2, pp. 161-62/998).

In January 2012, Dr. Landry found Brasseaux was doing well on her medications and prescribed Xanax, Lexapro, and Wellbutrin (Doc. 5-2, p. 112, 117/998).

From January 2012 through January 2015, Brasseaux underwent chiropractic treatment for neck and back pain at L5, C2, C3, C4, C5, C6, T7, and T8 (Doc. 5-2, pp. 232-258/998).

In April 2012, Brasseaux was referred by Dr. Snow for acupuncture to treat her fibromyalgia pain (Doc. 5-2, p. 6/998). Brasseaux also reported pain in her right

hip, right sided sciatica, lower back, and neck that is aggravated by wind, cold temperatures, and dampness (Doc. 5-2, p. 11/998). Treatments in April through July 2012 gave Brasseaux temporary relief (Doc. 5-2, pp. 6-24/998).

In July 2012, Brasseaux's main complaint was fibromyalgia. Dr. Landry added a trial of Cymbalta (Doc. 5-2, p. 119/998). In June 2013, Dr. Landry added Halcion to her medications (Doc. 5-2, pp. 125, 128/998).

In September 2012, Brasseaux was 63 inches tall, weighed 176 pounds, and her blood pressure was 120/60 (Doc. 5-2, p. 73/998). She complained of aching pain in her right hip (Doc. 5-2, p. 73/998). Brasseaux was diagnosed with allergic rhinitis, vitamin D deficiency, essential hypertension, hyperlipidemia, and unspecified hypothyroidism (Doc. 5-2, p. 73/998). Lab work was ordered and Brasseaux's blood pressure was monitored (Doc. 5-2, p. 75/998).

In January 2013, Brasseaux complained of severe left ear pain from an ear infection (Doc. 5-2, p. 79/998). Brasseaux underwent a tympanostomy (insertion of ear tubes) to alleviate a severe infection and near eardrum rupture in her left ear (Doc. 5-2, pp. 27-50, 80-81, 397-99/998). In March, 2013, a follow up appointment with Dr. Brad Lebert, an otolaryngologist, showed hearing loss in the left ear, sinus congestion (particularly in cold weather), allergic rhinitis, and a deviated nasal septum (Doc. 5-2, pp. 55-57/998). Brasseaux was prescribed Zetonna nasal spray and her tubes were removed a week later (Doc. 5-2, pp. 57, 63-67/998).

In May 2013, Brasseaux complained of abdominal pain (Doc. 5-2, p. 85/998). Dr. Jason R. Morris, a family medicine doctor, diagnosed malaise and fatigue,

essential hypertension, unspecified hypothyroidism, candidiasis (vaginal), and abdominal pain (right upper quadrant) (Doc. 5-2, pp. 93, 664/998). An ultrasound of her abdomen was unremarkable (Doc. 5-2, p. 85/998). A hepatobillary imaging ("HIDA") scan of Brasseaux was normal (Doc. 5-2, p. 96/998). Allergy testing showed Brasseaux is allergic to cow's milk, cow's milk cheeses, yogurt, eggs, and fish (Doc. 5-2, pp. 98-102/998).[2]

In August 2013, Brasseaux weighed 190 pounds and her blood pressure was 128/70 (Doc. 5-2, p. 111/998). She complained that her fibromyalgia flared up when she did any yard or house work (Doc. 5-2, p. 119/981). She was diagnosed with unspecified myalgia and myositis, insomnia, long term use of other medication, and unspecified hypothyroidism (Doc. 5-2, p. 113/998). Brasseaux weighed 190 pounds and her blood pressure was 128/70 (Doc. 5-2, p. 113/998).

In October 2013, Dr. Morris found Brasseaux was 49 y ears old, 5' 3" tall, and weighed 187 pounds (Doc. 5-2, pp. 106/998). Dr. Morris noted Brasseaux had been modifying her diet, and her fibromyalgia had improved overall, but she had right hip pain (Doc. 5-2, p. 106/998). Brasseaux did not sleep on her right side and was having difficulty walking (Doc. 5-2, p. 106/998). Brasseaux's triglycerides were high (Doc. 5-2, p. 106/998). Dr. Morris diagnosed unspecified myalgia and myositis, essential hypertension, unspecified hypothyroidism, hyperlipidemia, onchomycosis (toenails), and a cough (Doc. 5-2, p. 108/998). Brasseaux was prescribed meloxicam, zantac, Lamisil, and Valtrex (Doc. 5-2, p. 108/998).

---

[2] Repeat allergy testing in 2015 had the same results (Doc. 5-2, p. 608/998).

Also in October 2013, Brasseaux was diagnosed with dermatochalasis (excess upper eyelid skin that droops) that affected her vision, bilateral ptosis (abnormal positions of the eyelid margins), and bilateral brow ptosis (Doc. 5-2, pp. 273, 283-85/998). Brasseaux's eyes were small and deep set, her brow drooped a little and hooded her vision, and her eyes did not open enough due to extra skin on her upper eyelids (Doc. 5-2, p. 284/998). In November 2013, Brasseaux underwent blepharoplasty to remove the excess skin on her eyelids (an "eye lift") and improve her peripheral vision, bilateral upper lid fasanella (to correct the ptosis), and bilateral brow pexy to correct the brow ptosis (Doc. 5-2, p. 271/998).

Brasseaux was evaluated by Joseph Kahler, Ph.D. through a review of her medical records, on behalf of State Disability Determination Services (Doc. 5-1, pp. 72-74/259). Dr. Kahler found Brasseaux has an affective disorder that causes only mild limitations in her social functioning and concentration, persistence, or pace (Doc. 5-1, p. 74/259). Dr. Kahler further noted that, from January through August 2012, Brasseaux was doing well on the medication prescribed by Dr. Landry for her depression (Doc. 5-1, p. 74/250). In August 2012, Brasseaux's medications were adjusted due to her crying and feeling bad (Doc. 5-1, p. 74/259).

In April 2015, Dr. Morris wrote that he had treated Brasseaux for TMJ (temporomandibular joint) pain for over ten years (Doc. 5-2, p. 634/998). Dr. Morris stated Brasseaux had tried and found little relief from NSAIS's, muscle relaxers, and analgesics, so he recommended that she try Botox injections (Doc. 5-2, p. 634/998).

In a letter dated September 2015, Dr. Morris stated Brasseaux had been his patient since 2004 (Doc. 5-2, p. 990/998).    Dr. Morris included a physical residual functional capacity form for her physical limitations that existed both then and prior to December 31, 2012 (Doc. 5-2, p. 990/998).  Dr. Morris stated that Brasseaux could lift/carry less than 10 pounds occasionally, stand/walk less than two hours in an eight hour day, must periodically alternate sitting and standing to relieve pain or discomfort, and her ability to push/[pull is limited (she should avoiding doing it) in her upper and lower extremities due to pain (Doc. 5-2, pp. 991-92/998).

Brasseaux can sit for about an hour before she has to get up and walk for a few minutes to alleviate or improve the pain in her back, hips, and shoulders (Doc. 5-2, p. 992/998).    Brasseaux should never climb, crouch, or crawl, and should only occasionally balance or kneel (Doc. 5-2, p. 992/998).  Brasseaux is also limited in her ability to reach in all directions (including overhead), handle (gross manipulation), finger (fine manipulation), and feel, due to weakness in her shoulders and hips, stiffness and pain in her hands, and diminished sensation in her hands due to Raynaud's disorder (Doc. 5-2, p. 993/998).  Dr. Morris further noted that Brasseaux has nearly 100% loss of hearing in her left ear and 20% loss of hearing in her right ear due to surgeries and recurrent ear infections in 2013 (Doc. 5-2, p. 993/998). Brasseaux cannot tolerate cold temperatures (below 74° F); she is sensitive to noise; high humidity and wetness worsen her pain; and she cannot lift/operate equipment such as a vacuum cleaner or a mower (Doc. 5-2, p. 993/998).

Dr. Landry also wrote a letter in November 2015, stating that Brasseaux had been his patient since 1994 (Doc. 5-2, p. 995/998).  Dr. Landry completed a mental residual functional capacity form for Brasseaux's mental limitations prior to 2012, stating that Brasseaux suffers from depression, anxiety, poor sleep, inattentiveness, chronic and variable pain, chronic allergic rhinitis and congestion (which led to surgery with poor results), hypothyroidism, irritable bowel syndrome, overactive bladder, and fibromyalgia (Doc. 5-2, p. 996/998).  Dr. Landry found that Brasseaux has a poor ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; complete a normal workday or workweek; or perform at a consistent pace (Doc. 5-2, p. 996/998).  Brasseaux has only a fair ability to: remember locations and work-like procedures; understand and remember short, simple instructions; carry out short-simple instructions; perform activities within a schedule; maintain regular attendance and be punctual; work with or near others without being distracted by them; and make simple work-related decisions (Doc. 5-2, p. 996/998).

Dr. Landry further found that Brasseaux has a poor ability to respond appropriately to changes in the work setting, travel in unfamiliar places, or use public transportation (Doc. 5-2, p. 997/998).  Brasseaux has only a fair ability to interact appropriately with the public; ask simple questions; request assistance; accept instructions; respond appropriately to criticism from supervisors; get along with co-workers and peers; set realistic goals; or make plans independently of others (Doc. 5-

2, p. 997/998). Brasseaux has a good ability to maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions (Doc. 5-2, p. 997/998).

### C.  <u>Administrative Hearing</u>

At the May 2015 administrative hearing, Brasseaux testified she was then 50 years old and right-handed (Doc. 5-1, pp. 37-38/259). She had completed about a year and a half of college, and last worked in October 2012, doing sales for a funeral home (Doc. 5-1, pp. 37-38/259). Brasseaux quit working due to her fibromyalgia, depression, and anxiety (Doc. 5-1, p. 38/259). Brasseaux is married and lives in a home with her husband, who works in the funeral home and cemetery business (Doc. 5-1, p. 38/259). Brasseaux has one child (Doc. 5-1, p. 38/259).

Brasseaux does not do any housekeeping because her fibromyalgia pain flares up if she over-exerts (Doc. 5-1, pp. 39/259). Brasseaux's husband does the grocery shopping (Doc. 5-1, p. 51/259). She cannot shop for groceries because of pain, and she has a very low immune system and tends to catch flus, colds, and viruses (Doc. 5-1, p. 50/259). Brasseaux's husband does all of the cooking, sweeping, mopping, and vacuuming because of her fibromyalgia and hip pain (Doc. 5-1, p. 53/259). Brasseaux can put dishes in the dishwasher but cannot bend over to unload it, and she does laundry because her washer and dryer are positioned high (Doc. 5-1, p. 53/259). Brasseaux can shower, but sometimes needs assistance getting dressed and putting on shoes (Doc. 5-1, p. 53/259).

Brasseaux has problems sitting more than 20 minutes, so she has to get up and move around, she can stand for 15 to 20 minutes, and she can walk from a parking lot to an office (Doc. 5-1, p. 40/259). When she sits too long, Brasseaux's hip and the cysts on her spine start pinching the nerve that goes into her hip (Doc. 5-1, p. 50/259).

Brasseaux testified that she cannot alternate sitting and standing for a four-hour period (Doc. 5-1, p. 50/259). She would have to lay down at least one hour in a four-hour period (Doc. 5-1, pp. 50-51/259). Brasseaux is intolerant of the cold and has severe allergies, especially to insects (mosquitoes, deer flies, horse flies), so she cannot go outside and walk (Doc. 5-1, p. 40/259). Brasseaux can lift about five pounds and drives about once a week (to church) (Doc. 5-1, p. 51/259). Brasseaux stays for the entire church service because she alternates sitting and standing (Doc. 5-1, p. 55/259). She is able to climb stairs when she does not have vertigo (Doc. 5-1, p. 52/259). Bending from the waist makes her dizzy (Doc. 5-1, p. 52/259). Brasseaux also has trouble bending due to back pain; she cannot squat down; she cannot crawl; but she can kneel for up to ten minutes (Doc. 5-1, pp. 52-53/259). Brasseaux does not always sleep well at night, even with sleep medication, so she sleeps in the morning sometimes (Doc. 5-1, pp. 53-54/259).

Brasseaux testified that she went on short-term disability in 2006 due to illness, then resigned from her job because of her illness (Doc. 5-1, p. 41/259). Brasseaux had worked for the funeral home since she was 19 years old (Doc. 5-1, p. 41/259). In 2010, the funeral home asked Brasseaux to return to work (Doc. 5-1, p.

41/259).  Brasseaux worked from 2010 to 2012, but made very few sales, so she resigned in 2012 (Doc. 5-1, p. 41/259).  Prior to resigning in 2006, Brasseaux was a sales manager, and before that she was a salesman (Doc. 5-1, p. 41/259).  Brasseaux testified she used to make about 40 sales per year, but from 2010 to 2012 she made a total of 5 sales (Doc. 5-1, pp. 41-42/259).

Brasseaux testified her fibromyalgia was diagnosed 11 years ago (Doc. 5-1, p. 42/259).  Brasseaux had fibromyalgia pain in 2006 when she stopped working (Doc. 5-1, pp. 41-42/259).  Her fibromyalgia causes constant pain that flares up and worsens about twice a month, causing her to stay in bed five to seven days (Doc. 5-1, pp. 42-43/259).  Her fibromyalgia also fogs her memory, so she cannot concentrate or remember basic things like phone numbers (Doc. 5-1, p. 45/159).  Brasseaux's vision is blurry, she gets lost while driving, she forgets things she is cooking, and she cannot figure out paperwork (Doc. 5-1, pp. 44-45/259).  The "brain fog" affects her ability to focus and concentrate, so she cannot stay focused on a 30 minute TV show and cannot take oral instructions (Doc. 5-1, pp. 54-55/259).  Brasseaux had flare-ups weekly in 2006, when she went on disability (Doc. 5-1, pp. 42-43/259).  Flare-ups are caused by stress, over-exertion, cold, and changes in barometric pressure (Doc. 5-1, p. 44/259).

Brasseaux testified she also suffers from depression and anxiety (Doc. 5-1, p. 44/259).  The anxiety manifests itself through panic attacks (sweating and nausea) (Doc. 5-1, p. 44/259).  Brasseaux had panic attacks daily in 2006 (Doc. 5-1, p. 44/259).  Brasseaux's panic attacks are triggered by having to coordinate or multitask anything, and by driving (Doc. 5-1, p. 44/259).

Brasseaux testified her depression makes her cry a lot, she has mood swings, and sometimes she feels doomed (Doc. 5-1, p. 45/259). Brasseaux isolates herself a lot during depression, which she has two or more weeks each month (Doc. 5-1, p. 45/259).

Brasseaux has had headaches almost every day since her 20s, which have gotten progressively worse (Doc. 5-1, p. 45/259). Brasseaux has tried medication, acupuncture, physical therapy, massage therapy, infrared sauna, a nighttime mouth splint, and Botox, but nothing helps (Doc. 5-1, p. 46/259). Brasseaux had headaches almost every day in 2006 and still does (Doc. 5-1, p. 46/259).

Brasseaux's neck pain radiates into her right shoulder and hurts when she reaches overhead, but does not cause a limitation of motion (Doc. 5-1, p. 47/259). Brasseaux also has lower back pain that goes down her right hip and leg (Doc. 5-1, p. 48/259). Her back and hip pain are not continuous, and are triggered when she sits too long (Doc. 5-1, p. 48/259). Brasseaux takes medication and gets Toradol injections in her neck and back (Doc. 5-1, pp. 48, 55/259). Physical therapy helped her neck pain until she stopped doing it (Doc. 5-1, p. 48/259).

Brasseaux testified she was recently treated for vertigo (Doc. 5-1, p. 49/259). She has vertigo every four to six months, and has to avoid driving and climbing stairs when she has it (Doc. 5-1, p. 48259).

Brasseaux takes Celebrex, Gabapentin, Flexeril, Lexapro, Xanax, Wellbutrin, and Triazolam (Doc. 5-1, p. 39/259). Brasseaux testified that Flexeril and Celebrex cause her stomach problems and GERD, and Celebrex aggravates her IBS (Doc. 5-1,

p. 49/259).  Xanax makes her "foggy," and Flexeril and gabapentin (Neurontin) make her drowsy (Doc. 5-1, pp. 49-50/259).  Brasseaux testified that, for her fibromyalgia, she is on a regimen of medications, takes physical therapy, has taken acupuncture, is dong infrared sauna therapy, is doing medical massage therapy, stays warm, and does not over-exert herself (Doc. 5-1, pp. 55/259).

### D.    The ALJ's findings and conclusions.

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Brasseaux (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Brasseaux has not engaged in substantial gainful activity from January 1, 2007 through her date last insured, December 31, 2012, and that she has severe impairments of disorder of the cervical spine, disorder of the lumbar spine, fibromyalgia, and obesity, but she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 5-1, p. 21/259). The ALJ then found that, as of December 31, 2012, Brasseaux had the residual functional capacity to do the full range of light work and was still able to do her past relevant work as a sales counselor (Doc. 5-1, p. 28/259). The sequential analysis thus ended at Step 4, with a finding that Brasseaux was not disabled (Doc. 5-1, p. 28/259).

## II.    Law and Analysis

### A.    Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the

evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### B. The Appeals Council considered the new evidence and correctly found it did not change the ALJ's decision.

Brasseaux contends the Commissioner failed to properly evaluate the post-hearing treating source medical opinions from Dr. Phillip Landry and Dr. Jason Morris, regarding Brasseaux's functional abilities prior to her date last insured (December 31, 2012) (Doc. 8).  Brasseaux argues the Appeals Council failed to consider those opinions because they were written after the ALJ's decision and, therefore, were not material to Brasseaux's condition prior for December 31, 2012 (Doc. 8).

When a claimant submits new evidence to the Appeals Council, the Council must consider the evidence if it is "new and material" and if it "relates to the period on or before the ALJ's decision." See Sun v. Colvin, 793 F.3d 502, 511 (5th Cir. 2015) (citing 20 C.F.R. § 404.970(b)); see also Hardman v. Colvin, 820 F.3d 142, 150 (5th Cir. 2016). If the evidence is considered, then the Appeals Council will review the ALJ's decision only if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence" in the record as a whole. See Hardman, 820 F.3d at 150 (citing Sun, 793 F.3d at 511; 20 C.F.R. § 404.970(b)). Otherwise, the Appeals Council will deny the claimant's request for review. See Hardman, 820 F.3d at 150 (citing Sun, 793 F.3d at 511; 20 C.F.R. § 404.970(b)).

The regulations do not require the Appeals Council to provide a discussion of the newly submitted evidence or give reasons for denying review.[3] See Hardman, 820 F.3d at 150. Only when the Appeals Council makes a decision (when it grants review) must it follow the same rules for considering opinion evidence as ALJs follow. See Sun, 793 F.3d at 511 (citing 20 C.F.R. § 404.1527). The only question before this Court is whether the Appeals Council erred in concluding the new evidence did not make the ALJ's decision "contrary to the weight" of the record evidence on the whole. See Hardman, 820 F.3d at 150.

The Appeals Council stated that it considered the additional evidence submitted to it, and found it did not provide a basis for changing the ALJ's decision

---

[3] When the Appeals Council denies the claimant's request for review, that denial becomes part of the Commissioner's final decision. Sun, 793 F.3d at 511 (citing Higginbotham v. Barnhart, 405 F.3d 332, 337 (5th Cir. 2005).

(Doc. 5-1, p. 9/259).  The Appeals Council did not decline to consider the evidence and did not find it was immaterial.  Therefore, the Appeals Council did not fail to consider Brasseaux's new evidence.

Brasseaux also argues that the ALJ's decision was contrary to the residual functional limitations assigned by Dr. Morris and Dr. Landry.

Dr. Morris stated that Brasseaux could: lift/carry less than 10 pounds occasionally; stand/walk less than two hours in an eight hour day; must periodically alternate sitting and standing to relieve pain or discomfort; her ability to push/pull is limited in her upper and lower extremities; she can sit for about an hour before she has to get up and walk; should never climb, crouch, or crawl; and should only occasionally balance or kneel (Doc. 5-2, p. 993/998).  Dr. Morris further found Brasseaux is limited in her ability to reach in all directions (including overhead), handle (gross manipulation), finger (fine manipulation), and feel, due to weakness in her shoulders and hips, stiffness and pain in her hands, and diminished sensation in her hands due to Raynaud's disorder (Doc. 5-2, p. 993/998).  Brasseaux has nearly 100% loss of hearing in her left ear and 20% loss of hearing in her right ear (Doc. 5-2, p. 993/998).  Finally, Brasseaux cannot tolerate cold temperatures (below 74° F); she is sensitive to noise, high humidity and wetness; and she cannot lift/operate equipment such as a vacuum cleaner or a mower (Doc. 5-2, p. 993/998).

Dr. Landry found Brasseaux has a poor ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special

supervision; complete a normal workday or workweek; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; or perform at a consistent pace.  Brasseaux has only a fair ability to: remember locations and work-like procedures; understand and remember short, simple instructions; carry out short, simple instructions; perform activities within a schedule; maintain regular attendance and be punctual; work with or near others without being distracted by them; make simple work-related decisions; interact appropriately with the public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers and peers; and set realistic goals or make plans independently of others (Doc. 5-2, p. 996/998).

Brasseaux does not point out, specifically, how the ALJ's decision is contrary to the weight of the evidence *as a whole*.  It is noted that the ALJ stated (Doc. 5-1, p. 25 /259):

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision….

> The claimant has alleged numerous significant limitations, including exertional limitations, in her Function Report and at the hearing due to her pain and chronic fatigue (see exhibit 3E).  The claimant does have severe impairments of disorder of the cervical spine, disorder of the lumbar spine, and fibromyalgia, and has complaint of pain.  However, her allegations of the severity of the pain and fatigue are not supported by her activities or her medical records.

As to Brasseaux's allegations of limitations due to mental impairments, the ALJ concluded:

> Despite her allegations and testimony of severe panic attacks, problems with stress, mood swings, problems with side effects with her current medication, the medical evidence under evaluation herein does not support the allegations (see exhibit F). Not only do her treating records for mental impairments not reveal any significant problems, other records do not either.

(Doc. 5-1, p. 23/259). The ALJ also noted that Brasseaux had depression and anxiety before her alleged onset date and was able to work, she never sought mental health counseling,[4] and her problems have been managed with medication (Doc. 5-1, p. 22/259).

The ALJ also cited Brasseaux's trip to Germany in July 2008, her part time work from February 2007 to December 2009, and holding tasting parties and meetings for a distributorship that involved frequent lifting of 25 pounds (Doc. 5-1, p. 26/259). The ALJ noted that Brasseaux's fibromyalgia and neck problems did not preclude her from zip-lining in the summer of 2011. Brasseaux's pain ratings declined from December 2009 to September 2012, when she rated her pain as a 2. Also, as the ALJ found, Brasseaux's statements in July 2006 that she had resigned from her job to become a contractor, and had "stress" in January 2007 because her husband was unhappy that she was not working (Doc. 5-1, p. 27/259), indicate she did not stop working because of an impairment (Doc. 5-1, p. 27/259).

Brasseaux did not argue any specific areas in which the ALJ's decision is contrary to the weight of the evidence as a whole, and the undersigned does not find

---

[4] Counseling is provided by psychologists and licensed social workers.

any. Since the ALJ's decision is not contrary to the weight of the record evidence as a whole, the Appeals Council did not err in affirming the ALJ's decision.

Brasseaux also argues the Appeals Council should have given controlling weight to Dr. Landry's and Dr. Morris's opinions because they were Brasseaux's treating physicians. However, since the Appeals Council affirmed the ALJ's decision, it implicitly found the ALJ's decision was not contrary to the weight of the evidence as a whole. The Appeals Council was not required to give controlling weight to those opinions. See Sun, 793 F.3d at 511.

Since substantial weight supports the ALJ's decision, and the Appeals Council did not err in finding his decision is not contrary to the weight of the evidence as a whole, Brasseaux's appeal should be denied.

## III.  Conclusion

Based on the foregoing, IT IS RECOMMENDED that Brasseaux's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _7th___ day of February, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge

24